**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ASMED B.,** | |
| *Petitioner*, | Civil Action No. 20-3734 (MCA) |
| **v.** | **REDACTED OPINION** |
| **THOMAS DECKER, et al.,** | |
| *Respondents.* | |

**ARLEO, UNITED STATES DISTRICT JUDGE**

Petitioner Asmed B. ("Petitioner" or "Asmed B.") is a native and citizen of Colombia and longtime lawful permanent resident of the United States, who is currently in the custody of the United States Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE") and detained at Bergen County Jail (or "the Facility") in New Jersey.  On April 2, 2020, Petitioner filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241.  The matter was originally filed in the United States District Court for the Southern District of New York and was transferred to this District on April 7, 2020.  On April 8, 2020, Petitioner filed an Amended Petition and an Emergency Motion for a Temporary Restraining Order and Preliminary Injunction under Federal Rule of Civil Procedure 65, requesting the Court order his immediate release from detention based on his vulnerability to severe illness or death if he were to contract the novel coronavirus disease 2019 ("COVID-19").  ECF Nos. (the "Petition") 10 & 12.  Respondents oppose the Motion.  ECF No. 26.  Having reviewed the parties' detailed submissions, examined the applicable law, and directed the parties to provide supplemental information, the Court now grants Petitioner's Motion for a Preliminary Injunction and orders Respondents to immediately release Petitioner subject to the conditions set forth below.

1

# I.  FACTUAL BACKGROUND

## A.  The COVID-19 Health Crisis

On March 11, 2020, the World Health Organization classified COVID-19 as a global pandemic, anticipating that "the number of cases, the number of deaths, and the number of affected countries" would increase.[1]  Around that time, the United States had reported only seventy confirmed cases of COVID-19.  Today, that number has since risen to 938,590 and the virus has taken 48,310 lives nationally.[2]  New York and New Jersey have the greatest number of infections and deaths in the nation, and as of April 26, 2020, New Jersey reported a total of 105,523 total confirmed cases and 5,863 deaths.[3]  Bergen County, where Petitioner is detained, has the most confirmed cases of the virus in New Jersey, with a total of 14,738 confirmed positive cases and 954 deaths.[4]

According to the Centers for Disease Control and Prevention (the "CDC"), COVID-19 spreads "mainly from person-to-person" between those "who are in close contact with one another (within about 6 feet)" and from contact with contaminated surfaces.[5]  The most common symptoms of COVID-19 include fever, cough, and shortness of breath, but, notably, one need not present any symptoms to have the virus or be contagious.[6]

---

[1] World Health Org., *WHO Director-General's Opening Remarks at the Media Briefing on COVID-19 – March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[2] *Coronavirus in the U.S.: Latest Map and Case Count,* THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Apr. 26, 2020).

[3] *New Jersey Coronavirus Map and Case Count*, THE NEW YORK TIMES, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html, (last visited Apr. 26, 2020).

[4] *Id.*, https://www.nytimes.com/interactive/2020/us/new-jersey-coronavirus-cases.html#county (last visited Apr. 26, 2020).

[5] Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 25, 2020).

[6] *Id.*; Ctrs. for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Apr. 25, 2020).

Experts still have much to learn about how the virus spreads.  In early April, the CDC director, Dr. Robert Redfield, in an interview with National Public Radio affiliate WABE, stated that "a significant number of individuals that are infected actually remain asymptomatic.  That may be as many as 25 percent[,]" and this is important because asymptomatic individuals contribute to the transmission of the virus.[7]  Furthermore, those who become symptomatic can likely transmit the virus up to 48 hours before they show symptoms.[8]  These asymptomatic transmitters and individuals who are transmitting the virus before they become symptomatic help explain how rapidly the virus can spread.[9]

Certain individuals are at higher risk for severe illness or death if they contract COVID-19.  Among them are persons who are "older," are immunocompromised, or who have underlying health issues like asthma, chronic lung disease, HIV, heart conditions, diabetes, chronic kidney disease, and liver disease.[10]  There is presently no vaccine to prevent COVID-19 infections.[11]  The CDC and health experts thus emphasize the importance of "social distancing" (i.e. staying at least six feet apart), regularly disinfecting "high touch" surfaces, and wearing cloth face covering to curtail the spread of the virus.[12]

---

[7] *CDC Director On Models For The Months To Come: 'This Virus Is Going To Be With Us'*, NPR, https://www.npr.org/sections/health-shots/2020/03/31/824155179/cdc-director-on-models-for-the-months-to-come-this-virus-is-going-to-be-with-us.

[8] *Id.*

[9] *Id.* The CDC also states in its guidance that "[s]ome recent studies have suggested that COVID-19 may be spread by people who are not showing symptoms."  Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 25, 2020).

[10] Ctrs. for Disease Control and Prevention, *People Who Are at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited Apr. 25, 2020).

[11] Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/index.html (last visited Apr. 25, 2020).

[12] Ctrs. for Disease Control and Prevention, *supra* note 8.

Ultimately, "[t]he best way to prevent illness is to avoid being exposed to this virus."[13] But in truth, avoiding exposure to COVID-19 is impossible for most detainees and inmates in correctional facilities.  Detainees who meet the CDC's criteria for "higher risk" are the most vulnerable to a detention facility's shortcomings.  In its guidance for correctional facilities, the CDC has explained that, among other things, the crowded and fluid nature of detention facilities, the inadequate hygienic supplies, and the limited options for medical isolation present "unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."  *See* ECF No. 26-2, CDC March 2020 Interim Guidance ("CDC Interim Guidance") at 2.  Consequently, practicing social distancing and ensuring proper hygiene to minimize the risk of infection are exceedingly difficult.

### B. Petitioner's Medical Conditions

The Declaration submitted by Dr. Goldstein in support of the Petition places Asmed B. squarely in the group of individuals who are especially vulnerable to COVID-19.[14]  *See* ECF No. 11, Declaration of Robert Goldstein ("Goldstein Decl.") at ¶ 11.  First and foremost, Dr. Goldstein opines that Asmed B.'s ███████████ is a serious medical condition which makes him vulnerable to COVID-19 and complications that might arise from infection with the coronavirus. *Id.* at ¶ 12. █████████████████████████████████████████

████████████████████████████████.[15] ████████████

█████████████████████████████████████████

---

[13] *Id.*

[14] Petitioner has also submitted medical records demonstrating his underlying medical conditions. *See* ECF No. 15-1, Ex. D. ████████████████████████████████████████

[15] ████████████████████████████████████████████.
*See id.*



███████████████████████████████████████████████

████████████████████████████████████████ *Id.* █

███████████████████████████████████████████████

█████████████████████████ *Id.* ███████████████████

███████████████████████████████████████████████

█████████████████[16] *Id.* at ¶ 13. *Id.* █████████████████

██████████████████████████████████████9.[17] *Id.*

        █████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████

        ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

[16] ██████████████████████████████████████████████
████████████████████████████ *See id.*

[17] Dr. Goldstein's opinion is consistent with the information provided by the CDC ███████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
█████████████ *See id.*



Finally, Petitioner also has ████████ which is an independent risk factor for complications from COVID-19. *Id.* at ¶ 16. Dr. Goldstein explains that people who have ████ ████ must take extra precautions to prevent contracting COVID-19 as they are more likely to be infected and develop severe symptoms from the virus. *Id.* ███████████████████ ████████████████ *Id.* at ¶ 17. As such, Dr. Goldstein opines that he is at risk for severe complications if he contracts COVID-19.[18] *Id.*

### C.  COVID-19 Response at the Bergen County Jail

The measures to address COVID-19 at the Bergen County Jail are described in detail in the Ahrendt Declaration ("Ahrendt Decl."), s*ee* ECF No. 26-4, and include procedures for mitigating the risk of COVID-19 exposure from both external and internal sources.

To mitigate the risk of exposure from external sources, the Facility has suspended all ICE detainee intakes effective March 12, 2020, and is screening new county inmates, staff members, and vendors for the virus. Ahrendt Decl. ¶¶ 9.A., 9.B., 9.D. The Facility has also suspended all social visitations and tours, and only "no-contact" visits and telephone conferences are permitted with attorneys. Ahrendt Decl. ¶ 9.C.

---

[18] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

To mitigate the risk of exposure from internal sources, all detainees must remain in their cells at all times, "except for a thirty-minute period each day when they are permitted to exit the cell area."  Ahrendt Decl. ¶ 9.E.  To promote social distancing during that thirty-minute period, "only four inmates/detainees are permitted to leave the cell area" where they have "2643 square feet of space" for recreational use and showering.  *Id.*  Detainees and inmates have meals inside their cells to avoid congregating.  *Id.* ¶ 9.K.  With respect to cleaning and hygiene, "[a]ll housing units are sanitized no less than four times per day."  *Id.*  Respondents also indicate that "[t]he Facility provides disinfectant spray, hand sanitizer, and soap in every housing unit," *id.*, but do not claim that the detainees have free access to those cleaning and hygienic supplies.  To the contrary, as described below, Petitioner complains that he has sporadic access to basic hygiene products and no access to cleaning supplies.

The Facility also has isolation and quarantine protocols for confirmed and suspected cases of COVID-19.  Confirmed cases that do not require hospitalization are isolated in a designated area.  Ahrendt Decl. ¶ 9.H.  Symptomatic inmates or detainees who are awaiting test results are quarantined.  Ahrendt Decl. ¶ 9.H.  Finally, those who are asymptomatic but "have had a known exposure" to a confirmed COVID-19 case are "cohorted" together with restrictive movement for fourteen-day period.  Ahrendt Decl. ¶ 9.I.  Cohorting ends if no new COVID-19 case develops within that period.  *Id.*

The Facility has an on-site physician who is on-call 24/7 for emergencies and has added additional medical staff.  Ahrendt Decl. ¶ 7.  Detainees and inmates are permitted to make daily sick calls to on-site medical staff.  Ahrendt Decl. ¶ 9.G.  If detainees or inmates complain of illness, medical staff evaluates them.  Ahrendt Decl. ¶ 9.G.  Those who present with COVID-19 symptoms are provided a "surgical mask."  *Id.*  Detainees and inmates may be transported to a hospital for

evaluation, but Warden Ahrendt does not describe the circumstances under which that option is exercised. *See* Ahrendt Decl. ¶ 9.G. Nor does he state whether high-risk detainees like Petitioner are subject to those same procedures, or whether the Facility makes other accommodations based on their needs.

According to Sheriff Anthony Cureton of the Bergen County Sheriff's Office, as of April 21, 2020, 24 corrections officers, 6 sheriffs, and 4 nurses have tested positive for COVID-19.[19] According to the ICE website and the Bergen County Sheriff's Office, there are two confirmed cases of COVID-19 among ICE detainees.[20] As of April 21, 2020, there are six ICE detainees and eleven inmates suspected of COVID-19 infection who are on "medical observation" and awaiting testing results, and one inmate who has tested positive for COVID-19, who is not currently housed in the Bergen County Jail.[21]

### D.    Petitioner's Recent Experiences at the Bergen County Jail

Petitioner's recent experiences at the Bergen County Jail highlight gaps in the Facility's protocols. Petitioner reports that he developed a cough on March 27, 2020 and put in two requests to see medical staff, but medical staff had not responded as of April 14, 2020. *See* ECF No. 28-1, Declaration of Jessica Yi ("Yi Decl.") at ¶¶ 19-20. Instead, "jail staff" took his temperature. *Id.* Petitioner reports that on April 7, 2020, the nurse responsible for distributing his medications— who was in direct contact with Petitioner —was hospitalized with a fever and other COVID-19 symptoms. *Id.* at ¶ 5. As of April 10, Petitioner developed trouble breathing, and the following

---

[19] Insider New Jersey, *Bergen County Jail Update: 24 Corrections Officers, 6 Sheriff's Officers Currently Positive for COVID-19*,          https://www.insidernj.com/bergen-county-jail-update-24-corrections-officers-6-sheriffs-officers currently-positive-covid-19/ (last visited Apr. 25, 2020).

[20] U.S. Immigration and Customs Enforcement, *ICE Guidance on COVID-19*, https://www.ice.gov/coronavirus (last visited April 24, 2020).

[21] *See* Ahrendt Decl. at ¶¶9.M; 9.H; *see also* Insider New Jersey, *supra* n.19.

day, he and his attorney requested that medical staff speak with and examine him. *Id.* at ¶¶ 20-21. Despite those requests, Petitioner did not see medical staff that day. *See id.* Two days later, "a facility staff member" took Petitioner's temperature and told him his temperature was not high enough to merit follow-up care. *Id.* at ¶ 22. The staff member merely told Petitioner that his temperature was "normal" and that he was "likely experiencing symptoms of anxiety." *See id.* On Monday, April 13, ██████████████████████████████████████████████████████ ████████████████████████. *Id.* at ¶ 23. As of that day, Petitioner reported extreme fatigue and a limited sense of smell. *Id.* at ¶ 24.

Petitioner reports that he has not received routine doctor appointments for his underlying health conditions. Although he has received his ████████████ medications, he has not seen his ████████████████ doctor responsible for ████████████. *Id.* at ¶ 18. Bergen County Jail officials also denied his requests to see a ████████ and a ██████████████. *Id.* Petitioner continues to experience ████████████ and asked for medical attention for those symptoms around three weeks ago, but he has not been seen by a doctor or a specialist. *Id.* at ¶ 18.

To make matters worse, the Facility has not provided Petitioner with cleaning supplies to disinfect his cell or basic hygiene items for personal care. Instead, Petitioner has to purchase shampoo from the commissary to clean his floor, toilet, and sink. *See id.* at ¶ 6. His access to personal hygiene products is sporadic, and he has experienced days without soap in his cell. *See id.* ¶ 7. For example, on March 26, 2020, he requested soap but was told the Facility was "out of stock" and did not receive it until the following day. *Id.* In addition, on April 6, Petitioner again ran out of soap but did not receive a replacement for more than 24 hours. *See id.* Without this basic hygiene item, he is not able to wash and disinfect his hands. *See id.* at ¶ 7. Since March 24,

2020, Petitioner has twice gone without toilet paper for two consecutive days, and toothpaste for two days. *Id.* at ¶ 8. On April 5, 2020, the Bergen County Jail cancelled laundry service because the persons responsible for managing it were placed in quarantine, and, consequently, the service did not resume until four days later. *Id.* at ¶ 9. It is not clear whether Petitioner and other detainees and inmates were given alternative means to wash their clothes and bedsheets during that time.

Petitioner reports that detainees are permitted to be outside their cells for thirty minutes of free time per day, and he uses this time to shower and to call his attorney. *Id.* at ¶ 10. The number of working showers are limited: there are currently only four in operation for over sixty detainees in his unit. *See id.* at ¶ 10. Those that are working are dirty and have fungus. *See id.* Petitioner has never seen the showers sanitized between uses. *Id.* He further reports that the communal phones are not sanitized after use. *Id.* at ¶ 12. Petitioner has observed detainees trying to cover the phones with socks to protect themselves—they are not provided gloves to use when holding the phones—but doing so makes it difficult for detainees to hear or be heard during phone calls. *Id.*

Petitioner also reports that he assists with meal delivery three times every day where he is less than a foot away from other detainees. *Id.* at ¶ 13. On April 10, 2020, Petitioner received a surgical mask and was told to use it for two weeks. *Id.* Petitioner does not always receive gloves to deliver the food, and on a few occasions, he has not used gloves at all. *Id.* Other times, he has received only one glove to use on the hand he is using to deliver the food and drink. *Id.* Fellow detainees are in close proximity to Petitioner during food deliveries; they approach his food cart, pick up a tray, and take it to a microwave to warm up the food. *Id.* at ¶ 14. The microwave is not sanitized between use by detainees. *Id.* On April 11, 2020, one of the detainees in Petitioner's unit found a piece of rodent, with hair and blood, in his food. *Id.* at ¶ 15. The detainee who

discovered it was taken for medical attention.  *Id.*  Several other detainees, including Petitioner, had vomiting and diarrhea after eating the same meal, but did not receive medical attention.  *Id.*

Petitioner reports that correction officers wear gloves and face masks some, but not all, of the time, and he has observed officers remove face masks to speak to detainees.  *Id.* at ¶ 16.  In addition, officers often remove their masks to speak to him.  *Id.*  When taking temperatures, staff come to the cell door and place a thermometer close to a person's forehead, without touching the skin, and staff do not always use gloves when doing so.  *Id.* at ¶ 17.

**E.      Petitioner's Requests for Parole and a Bond Hearing**

On Monday, March 23, 2020, Petitioner submitted a parole request asking that ICE exercise its discretion or parole authority to release him.  Am. Pet. at ¶ 7.  ICE replied on Wednesday, March 25, 2020, indicating that they were reviewing his request.  *Id.* Also, on March 25, 2020, Petitioner submitted a bond hearing request to the Varick Street Immigration Court.  *Id.*

On April 10, 2020, ICE denied Petitioner's request for release, citing his criminal history and mandatory detention pursuant to § 1226(c):

> U.S. Immigration and Customs Enforcement (ICE) is in receipt of the request for release from custody on behalf of your client, Asmed B[]. A review of [Asmed B.'s] case indicates that he was arrested by ICE on February 8, 2019 and served a Notice to Appear charging him under Section 237(a)(2)(A)(iii) of the Immigration and Nationality Act (INA).A review of his criminal history indicates that on August 3, 2017, he was convicted of Conspiracy to Commit Health Care and Mail Fraud, in violation of Title 18, United States Code, Section 1349; Health Care Fraud, in violation of Title 18, United States Code, Section 1347; and Mail Fraud, in violation of Title 18, United States Code, Section 1341 in the United States District Court for the Southern District of New York.  Based on your client's criminal convictions, he is subject to the mandatory detention provisions of INA Section 236(c).

11

ECF No. 26-8, Ex. I to Answer.[22]  The letter denying release also states that "medical staff at Bergen County Jail have reviewed [Asmed B.'s] medical history and have advised ICE that [he] is receiving the necessary medical attention."  *Id.*  Because Petitioner is detained pursuant to § 1226(c), he is not eligible for discretionary release per the ICE Updated Guidance Re: COVID-19, as those subject to mandatory detention "may not be released in the exercise of discretion during the pendency of removal proceedings even if potentially higher-risk for serious illness from COVID-19."  *See* ECF No. 26-1, ICE Updated Guidance Re-COVID-19 4/4/2020.

## II.   STANDARDS OF REVIEW

### A.   Preliminary Injunction

Motions for temporary and preliminary injunctive relief are governed by a four-factor test.[23]  The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm.  *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).  Under the first factor, the movant must show that "[he or she] can win on the merits." *Id.*  This showing must be "significantly better than negligible but not necessarily more likely than not."  *Id.*  The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief.  *Id.*  If these "gateway factors" are satisfied, the Court considers the third and fourth factors, which aim to balance the equities by examining the potential for harm to others if relief is granted and whether the public interest favors injunctive relief.  *Id.* at 176, 179.  The Court must then balance all four

---

[22] Petitioner disputes that he is subject to detention under § 1226(c).  *See* Reply Br. at 3, ECF No. 28.

[23] The Court considers Petitioner's motion as a request for a preliminary injunction because it will be issued with notice to the adverse party pursuant to Fed. R. Civ. P. 65, and because it seeks to alter, rather than maintain, the status quo.  *See Hope v. Warden York County Prison*, 2020 WL 1922372, at *2-4  (3d Cir. Apr. 21, 2020) (Precedential) (addressing jurisdiction only and finding TRO issued by district court to be an appealable injunction).

factors to determine, in its discretion, whether the circumstances warrant injunctive relief.  *Id.* at 179.

### B.        The "Extraordinary Circumstances Standard" for Bail

The parties agree that the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986) establishes that "extraordinary circumstances" are required before "bail may be granted to a habeas petitioner prior to a ruling on the merits of the petition."  *Id.* at 367.  Citing *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), the Third Circuit in *Lucas* noted that extraordinary circumstances may be established where the district judge had ordered a state inmate released to enter a hospital because the inmate was extremely ill.  *Id.* at 366-67.  The panel, however, did not expressly limit the finding of extraordinary circumstances to situations involving a petitioner's poor health.  *Id.* at 367.  Like injunctive relief in general, granting bail to a habeas petitioner is an extraordinary remedy.  *See Landin v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) (indicating that a court may only grant release pending a disposition of federal habeas claims when the petitioner has raised "substantial constitutional claims upon which he has a high probability of success, and . . . when extraordinary or exceptional circumstances exist which make the grant of bail necessary to make the habeas remedy effective") (citation omitted)); *see also In re Soule's*, 688 F. App'x 134, 135-36 (3d Cir. 2017).  Recent decisions, including a decision by this Court, have applied this standard to determine whether extraordinary circumstances exist in the context of the COVID-19 pandemic to grant bail to immigration habeas petitioners.  *See, e.g., Cristian A.R. v. Decker*, Civ. Act. No. 20-3600 (D.N.J. Apr. 12, 2020); *Rafael L.O.*, 2020 WL 1808843, at *5 (D.N.J. Apr. 9, 2020); *see also Coronel v. Decker*, No. 20-2472, 2020 WL 1487274, at *8 (S.D.N.Y. Mar. 27, 2020) (applying an analogous Second Circuit standard set forth in *Mapp v. Reno*, 241 F.3d 221, 226 (2d Cir. 2001)).

13

## III.    DISCUSSION

The Court finds that Petitioner has met the standard for a preliminary injunction and has

likewise met the extraordinary circumstances standard for granting bail in a habeas matter.

### A.    Preliminary Injunction

#### 1.    Likelihood of Success on the Merits

Respondents argue that Petitioner is unlikely to succeed on the merits because he is

mandatorily detained pursuant to 8 U.S.C. § 1226(c) and does not have a due process right to a

discretionary grant of parole.  Respondents further assert that district courts are without discretion

to review the Government's decision to grant or deny parole.  *See* ECF No. 26, Answer at 15.

Petitioner, however, does not assert that he has a due process right to parole or ask this Court to

review DHS's decision to deny him parole; rather, he asserts a violation of his substantive due

process rights, arguing that his conditions of confinement amount to punishment under the Due

Process Clause and that Respondents have demonstrated deliberate indifference to his serious

medical needs.[24]

---

[24] Respondents' detention of Petitioner triggers a corresponding obligation under the Constitution to provide for Petitioner's reasonable safety and medical needs:

> [W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well being. . . .The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment. . . .

*Helling v. McKinney*, 509 U.S. 25, 32 (1993) (alterations in original and internal quotation marks omitted) (considering the rights of convicted prisoners) (quoting *DeShaney v. Winnebago Cty. Dept. of Soc. Svcs.*, 489 U.S. 189, 199-200 (1989)).  This same rationale applies here because a detainee's rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *See City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983).

The Court first addresses Petitioner's claim that his detention amounts to punishment. Because Petitioner is a civil detainee as opposed to a convicted and sentenced prisoner, his conditions of confinement claim is analyzed under the Due Process Clause of the Fifth (or Fourteenth) Amendment, as opposed to the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535-36 (1979).  Convicted and sentenced prisoners are protected from punishment that is "cruel and unusual," while pretrial and civil detainees are protected from any punishment. *See Hubbard v. Taylor*, 399 F.3d 150, 166-67 (3d Cir. 2005).  The law in the Third Circuit is clear that civil immigration detainees are entitled to the "same due process protections" as pretrial detainees with respect to conditions of confinement. *See E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019). An immigration detainee can bring a claim for violation of those protections when the conditions of confinement fall below constitutional minimums. *Id.*

In *Helling*, the Supreme Court held that exposure to environmental tobacco smoke states an Eighth Amendment cause of action even though the inmate was asymptomatic because the health risk posed by involuntary exposure to second-hand smoke was "sufficiently imminent." *Id.* at 35.  As relevant to Petitioner's conditions claims, *Helling* also recognized that inmates are entitled to relief under the Eighth Amendment where they prove threats to personal safety from exposure to serious contagious diseases:

> In *Hutto v. Finney*, 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed.2d 522 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed.  We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery.  Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

15

*Id.* at 33.[25]

*Helling* provides the theory for Petitioner's conditions claim but not the legal standard. Because Petitioner is an immigration detainee and not a convicted prisoner, the Court asks whether the challenged conditions are reasonably related to a legitimate governmental objective.  If they are not, the Court may infer "'that the purpose of the governmental action is punishment that may not be constitutionally inflicted upon detainees qua detainees.'"  *Sharkey*, 928 F.3d at 307 (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).  A complained-of condition or deprivation amounts to punishment if: "the disability is imposed for the purpose of punishment"—that is, there is "an expressed intent to punish on the part of detention facility officials"; no "alternative purpose to which [the condition or deprivation] may rationally be connected is assignable for it"; *or* the condition or deprivation is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)). The Court's "inquiry into whether given conditions constitute 'punishment' must consider 'the totality of circumstances within an institution.'"  *Hubbard*, 399 F.3d at 160 (quoting *Union Cty. Jail Inmates v. DiBuono*, 713 F.2d 984, 996 (3d Cir.1983)).

Respondents assert that Petitioner's conditions-of-confinement claim fails because the conditions at the Bergen County Jail do not amount to punishment of Petitioner, particularly in light of the Facility's preventative measures against the spread of COVID-19.  ECF No. 26, Answer at 15.  The Court disagrees.

---

[25] Courts interpreting this language have held that inmates can state an Eighth Amendment claim for confinement with inmates who have a serious contagious disease that is spread by airborne particles, such as tuberculosis.  *See Bolton v. Goord*, 992 F. Supp. 604, 628 (S.D.N.Y. 1998) (citing *Helling*, 509 U.S. at 33, for the proposition that "[t]he practice of putting inmates who have serious communicable diseases together is actionable under the Eighth Amendment," but rejecting the petitioner's claim because there were no cases of active tuberculosis cases among inmates since the practice of "double celling" began).

In *Cristian A.R. v. Decker*, No. 20-3600 (D.N.J. Apr. 12, 2020), this Court applied the reasoning of *Thakker v. Doll*, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) and *Rafael L.O.*, and found that the conditions of confinement at Bergen County Jail, the Facility at issue here, and Hudson County Jail, amounted to punishment as to five detainees who had medical conditions that made them vulnerable to serious complications or death if they contracted COVID-19.  *See id.*, ECF No. 26, Op. at 21-22; *see also Jeferson V. G. v. Decker*, No. 20-3644, 2020 WL 1873018 (D.N.J. Apr. 15, 2020); *Marvin A. G. v. Decker*, No. 20-1689 (D.N.J. Apr. 14, 2020).

As the Court in explained in *Cristian A.R.*, "given the heightened risk of COVID-19 exposure, the CDC Guidelines have made clear that correctional facilities must make 'all possible accommodations' to prevent transmission of infection to high-risk individuals."  ECF No. 26, Op. at 22 (quoting CDC Interim Guidance at 16, 20).  As it did in *Cristian A.R.*, the Court recognizes in this matter that Bergen County Jail has implemented laudable, general protocols to address the pandemic, but finds that the protocols are insufficient to ensure the protection of the most medically vulnerable detainees in their care.

Respondents still have no specific protocols in place to protect the most medically-vulnerable people in their custody and are testing only symptomatic individuals, *see* Ahrendt Decl. ¶¶ 9.B; 9.G, even though asymptomatic individuals can transmit the virus.  Furthermore, only those inmates or detainees that exhibit signs or symptoms of COVID-19, including fever or respiratory illness, are provided a surgical mask.  *Id.* at ¶ 9.G.  And, while the Facility cohorts those who have had a known exposure to the virus, they do not indicate whether high-risk individuals like Petitioner are ensured separation or adequate space from others in the cohorting environment.

Like the petitioners in *Cristian A.R.*, Petitioner in this action cannot adequately protect himself from the threat of COVID-19 while detained at the Facility.  First, based on the record, the

Facility lacks basic cleaning measures to prevent the spread of the virus.  It appears that the Facility expects detainees and inmates to clean and disinfect their cells yet does not provide cleaning products for them to do so.  Instead, Petitioner is forced to rely on shampoo that he purchases to clean his cell, and on several occasions, he has been deprived of soap, leaving him unable to perform the most effective measure of combatting the spread of the virus: washing and disinfecting his hands.  *See* Yi Decl. ¶¶ 6-7.  This is especially alarming given that Petitioner also reports he recently had in-person contact with a nurse who was subsequently hospitalized with COVID-19 symptoms.  *Id.* at ¶ 5.  Despite these glaring gaps in the Facility's COVID-19 cleaning protocols, Respondents do not indicate how often soap or other hygiene products are provided to detainees. *See* Ahrendt Decl. at ¶ 9.K.

The Facility's sanitization efforts in common areas are similarly deficient.  Like the petitioners in *Cristian A.R.*, Petitioner reports that, having not been provided with gloves by the Facility, detainees have resorted to using socks to cover the shared phones, which are not disinfected between uses.  Their ability to do their laundry, including the socks they use to cover possibly-infected phones, has, at least on one occasion, been inhibited by the Facility's suspension of laundry service.  *See* Yi Decl. at ¶ 9.  In addition, the Facility neither cleans nor disinfects the microwaves or showers between uses.  *Id.* at ¶¶ 10, 12-13.  Only four showers are in operation for over sixty detainees in Petitioner's unit, yet those that are functioning are dirty and have fungus. *Id.*  The Facility does not indicate what, if any, measures it has taken to fix the non-working showers or to remove the fungus from those in operation.  The lack of operating and clean showering facilities is further compounded by the Facility's failure to timely provide soap to inmates for use in their cells.

The Facility's protocols also fall short of adequately protect detainees and inmates during meal times.  When Petitioner delivers food as part of his meal delivery responsibilities, he comes directly in-contact with other detainees and inmates, who approach his cart to pick up their meals, is not provided with gloves to use every shift, and has been instructed to wear the same mask for two weeks.  *See id.* at ¶¶ 6-17.  Assuming that Petitioner could stop delivering food to other detainees, the threat remains from other food delivery persons who provide Petitioner his daily meals, as well as contaminated shared items and surfaces in common areas and from a potentially-infected cellmate and staff.

Petitioner further reports that he is receiving no medical treatment for ▉▉▉▉▉▉▉▉ or for his recent cough and breathing difficulties.  *See id.* at ¶¶ 5, 18-24.  He similarly has not seen his ▉▉▉▉▉▉▉ doctor, ▉▉▉▉▉▉▉▉▉▉▉ or any other specialist for his underlying health conditions.  The Court raises these medical care issues to highlight the extraordinary circumstances surrounding Petitioner's detainment during this global crisis.[26]

Here, having viewed the totality of the circumstances, the Court finds that Petitioner is likely to succeed on his claim.  As this Court found in *Cristian A.R.*:

> By failing to implement the CDC's instructions for the most vulnerable individuals, and by detaining those persons in a jail setting during a rapidly accelerating COVID-19 pandemic without providing them with adequate means to follow hygiene and other health protocols, Respondents have placed Petitioners at a substantially enhanced risk for severe illness or death.  There can be no greater punishment.

---

[26] Civil detainees also have a constitutional right to adequate health care, and such claims are governed by the deliberate indifference standard.  *See Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 585 (3d Cir. 2003) (holding that a reasonable jury could conclude that a governmental entity's failure to establish a policy to address inmates' immediate medication needs constituted deliberate indifference); *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 585 (3d Cir. 2004) (detention center's lack of policies to address the physical and mental health needs of residents caused the plaintiff harm).  Because the Court finds that Petitioner is likely to succeed on his claim that the conditions of confinement at Bergen County Jail amounts to punishment, the Court need not decide whether Petitioner can establish deliberate indifference to his serious medical needs.

*Cristian A.R.*, Op. at 25.  Accordingly, the Court is satisfied that Petitioner has demonstrated that his conditions of confinement amount to punishment under the Due Process Clause.

### 2.   Irreparable Harm

To be entitled to a preliminary injunction, a movant must also establish that he or she is "more likely than not" to suffer irreparable harm absent the requested relief.  *See Reilly*, 858 F.3d at 179.  Respondents argue that Petitioner cannot meet the irreparable harm requirement because his likelihood of contracting COVID-19 is speculative in light of the precautions taken at Bergen County Jail and because his injury is not redressable by release.[27]  *See* ECF No. 26, Answer at 19-21.

The Court disagrees that Petitioner's likelihood of contracting COVID-19 is speculative for the reasons already highlighted above.  As the Supreme Court observed in *Helling*, "it would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them."  509 U.S. at 33 (noting that "the Courts of Appeals have plainly recognized that a remedy for unsafe conditions need not await a tragic event").

Curiously, Respondents also argue that Petitioner does not explain how release from the Bergen Facility into the greater New York area, the current center of America's COVID-19 crisis, will reduce his risk of contracting the illness.  In response, Petitioner explains the obvious: if he is released, he will no longer be in forced close contact with other people or with surfaces that go unsanitized.  Reply Br. at 12.  The supplemental declaration submitted by Petitioner's counsel also

---

[27] Respondents also cite to *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir.1994) (reversing grant of preliminary injunction compelling county to issue a building permit because plaintiff would not suffer irreparable harm by delaying building and injunction did not maintain the status quo) for the proposition that "[a] party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity." *Id.* at 653.  Here, Petitioner has met this burden by providing evidence that his multiple medical conditions place him at risk of serious complications or death if he contracts COVID-19.

states that he owns an apartment in New Jersey and lives alone. *See* ECF No. 34, Yi Supplemental Decl. at ¶ 4.

As the Court found with respect to the Petitioners in *Cristian A.R.*, Asmed B. has also demonstrated irreparable harm should he remain detained at Bergen County Jail. *See* No. 20-3600, slip. op. at 26; *see also Rafael L.O.*, 2020 WL 1808843, at *8; *Thakker*, 2020 WL 1671563 at *7 ("[C]atastrophic results may ensue, both to Petitioners and to the communities surrounding the Facilities."); *see also Hope v. Doll*, No. 20-562 (M.D. Pa. Apr. 7, 2020) ("We cannot allow the Petitioners before us, all at heightened risk for severe complications from COVID-19, to bear the consequences of ICE's inaction."); *Coronel*, 2020 WL 1487274, at *8 (finding that "[d]ue to their serious underlying medical conditions" and their placement in immigration detention, where they are "at significantly higher risk of contracting COVID-19," the petitioners "face a risk of severe, irreparable harm").

### 3.    Balancing of the Equities

"Before granting an injunction, a district court must balance the relative harm to the parties, i.e., the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merch Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002) (internal citation omitted). Here, the Court finds the potential of injury to Petitioner is high for the reasons set forth above. Notably, the public interest also supports the release of Petitioner before he contracts COVID-19 to preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems. *See Rafael L.O.*, 2020 WL 1808843, at *9.

Respondents also have a legitimate interest in ensuring that Petitioner does not flee and in protecting the public. As Judge Vasquez found in *Rafael L.O.* and this Court recently found in

*Cristian A.R.*, those very important interests are adequately addressed by fashioning appropriate conditions of release. *See Cristian A.R.*, No. 20-3600, slip. op. at 27.  In August 2017, Petitioner was convicted of Conspiracy to Commit Health Care and Mail Fraud, in violation of 18 U.S.C. § 1349; Health Care Fraud, in violation of 18 U.S.C. § 1347; and Mail Fraud, in violation of 18 U.S.C. § 1341.  ECF No. 26, Gov't Br. at 7 & Ex. E at 4.  In December 2018, Petitioner violated supervised release by using a controlled substance, and he received a 60-day sentence.[28]  *Id.* at 7, Ex. G.  Although the Court agrees that Petitioner's 2017 conviction and 2018 violation of supervised release are serious, his criminal history involves nonviolent offenses, and he has significant ties to this country such that he can be safely released on reasonable conditions of supervision.  The Court is also satisfied that there are reasonable conditions that can ensure the Petitioner's appearance for future immigration proceedings.  The specific conditions of release are set forth in the Order accompanying this Opinion.

### B.    Extraordinary Circumstances Justify Releasing Petitioner from Detention

Finally, Petitioner in this matter is vulnerable to severe complications and death if he contracts COVID-19 and is incarcerated at Bergen County Jail at the epicenter of the outbreak where he cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene to stop the spread of the virus.  These facts warrant the extraordinary remedy of release on bail, and make bail necessary, to make the habeas remedy effective.  *See Landano*, 970 F.2d at 1239.

Respondents assert that the proper remedy in this matter is a bail hearing before an immigration judge and notes in their Answer that the Varick Street Immigration Court in New

---

[28] In 2002, Petitioner was arrested and charged with driving while intoxicated and possession of a controlled substance, which he did not disclose in his 2002 application for naturalization. *See id.* at 7 and Ex. F, IJ Decision at 6-7.  This arrest is too temporally distant to outweigh the Court's other findings.

York is currently "operating."  Answer at 26.  Yet Respondents also acknowledge that Petitioner has received no response to his March 25, 2020 request for a bond hearing, *id.* at 14, and have provided no assurances that Petitioner could be afforded an immediate bond hearing if so ordered by the Court.  In *Cristian A.R.*, this Court expressly noted the recent chaos at the Varick Street Immigration Court caused by the COVID-19 pandemic, which has resulted in delayed bond proceedings, lack of access to counsel, and the closure of bond offices in New York and New Jersey, *see Cristian A.R.*, No. 20-3600, slip. op. at 28-29.  Respondents statement that the Varick Street Immigration Court is currently "operating" does little to alleviate those concerns.  As such, the Court continues to find that COVID-19's impact on the Varick Street Immigration Court is an extraordinary circumstance that weighs in favor of release under appropriate conditions for Petitioner.  *See id.* at 28-29.

## IV.     CONCLUSION

For the foregoing reasons, Petitioner's Emergency Motion for a Preliminary Injunction, ECF No. 12, is **GRANTED**, and the Court orders Petitioner's immediate release subject to the conditions as ordered.  An appropriate Order accompanies this Opinion.

Dated:  April 29, 2020                              */s Madeline Cox Arleo*_____
                                                    **Hon. Madeline Cox Arleo**
                                                    **UNITED STATES DISTRICT JUDGE**